## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 10 2019, 5:32 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William R. Grimes, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | April 10, 2019 <br><br> Court of Appeals Case No. 18A-CR-1583 <br><br> Appeal from the Sullivan Superior Court <br><br> The Honorable Hugh R. Hunt, Judge <br><br> Trial Court Cause No. 77D01-1805-CM-328 |

**Mathias, Judge.**

[1] William R. Grimes ("Grimes") appeals his conviction of Operating While Intoxicated as a Class C Misdemeanor from the Sullivan Superior Court. He

argues that the State presented insufficient evidence to prove the charge beyond a reasonable doubt.

[2] We affirm.

## Facts and Procedural History

[3] On May 15, 2018, around 10:15 a.m., Lieutenant William Snead ("Lieutenant Snead") with the Sullivan County Sherriff's Department observed Grimes driving in his vehicle. Lieutenant Snead saw that the passenger side of the windshield on Grimes's vehicle was shattered and caved in. Lieutenant Snead had stopped Grimes approximately two months earlier and had warned him not to drive until he had fixed his windshield. Because Grimes was still driving this vehicle and had not fixed the windshield, Lieutenant Snead activated his emergency lights in order to initiate a traffic stop.

[4] Grimes put his arm out of the window in order to acknowledge Lieutenant Snead; however, Grimes continued to drive. Lieutenant Snead pulled up next to Grimes and told him to "pull over, pull over." Tr. p. 9. However, Grimes continued driving. After continuing to drive a bit more, Grimes eventually pulled over into a nearby field. When Lieutenant Snead approached the vehicle, he asked Grimes why it took so long for him to pull over. Grimes responded that he was "just trying to get off the road." Tr. p. 12. When asked about the windshield, Grimes responded that he had not had time to get the windshield fixed.

[5]     Grimes provided Lieutenant Snead his driver's license, and Lieutenant Snead asked for Grimes's registration. Grimes searched through his glove box and handed the Lieutenant his insurance information. Lieutenant Snead explained that he did not need insurance information and again asked Grimes for his registration. Grimes searched his glove box for about thirty to forty more seconds before producing his registration.

[6]     The lieutenant, observing a screw driver on the dashboard, asked Grimes to step out of his vehicle. He asked Grimes if he had any weapons on him, and Grimes informed the Lieutenant that he had a knife on him and placed the knife on the driver's seat of the car. Lieutenant Snead noticed another knife on Grimes and removed this second knife. He then conducted a pat-down for weapons which did not produce any further weapons.

[7]     Lieutenant Snead observed that Grimes was behaving differently than during his previous interactions with Grimes. Specifically, Grimes was slow to respond to the officer's questions. He had a slow reaction speed in general, moving and speaking slowly. Lieutenant Snead also observed that Grimes's pupils were constricted to the size of pinpoints as if a bright light was shining in his eyes although Grimes was parked in the shade.

[8]     Lieutenant Snead returned to his vehicle in order to request a second officer. He also ran a check on Grimes's license and registration. He then returned to Grimes's vehicle and administered field sobriety tests. He performed the

Horizontal Gaze Nystagmus ("HGN") test, the one-leg stand test, and the walk and turn test.

[9] When Lieutenant Snead administers the walk and turn test, he observes to see if the individual uses arms to balance, does not touch heel to toe, starts too early, loses balance, steps off the line, or turns improperly. When Grimes performed the walk and turn test, he stepped off the line three different times. He also walked "in a big U" to turn around instead of keeping one foot on the ground and pivoting to turn around. Tr. p. 17.

[10] During the one-leg stand test, the individual being tested is to stand with his or her arms to their sides, "hold one leg up in the air, look at their foot, hold it up about six inches and count to thirty by going one thousand one, one thousand two, all the way to thirty." Tr. p. 18. Grimes skipped a couple numbers when counting to thirty, but Lieutenant Snead graded Grimes as passing this particular test.

[11] When Lieutenant Snead administered the HGN test, he asked Grimes if he had any problems with his eyes. Grimes indicated that he did not see well out of one of his eyes; but he did not indicate that would be a problem for completing the test. Lieutenant Snead observed a lack of "smooth pursuit," and his eye showed nystagmus before the forty-five degree onset where the eyes involuntarily twitch. Tr. p. 16.

[12] The lieutenant scored Grimes as failing the walk and turn test and the HGN test. After administering these tests, Lieutenant Snead began to read Grimes the

implied consent warning in order to administer a chemical test. Grimes then asked Lieutenant Snead, "well what if I would have had smoked marijuana a couple days ago[? T]hat would be in my system.'" Tr. p. 21. After Lieutenant Snead informed Grimes that smoking marijuana a couple days ago would not have an effect on him at that moment, Grimes stated, "[w]ell, I'm not saying I smoked marijuana two days ago." Tr. p. 21.

[13] At some point during Lieutenant Snead's interactions with Grimes, Deputy Copeland arrived as back-up. Because Grimes was "argumentative" with Lieutenant Snead regarding his decision to arrest him, Deputy Copeland also performed field sobriety tests on Grimes. Lieutenant Snead observed, but did not participate, in the second set of field sobriety tests. He remained by his vehicle, away from the interactions between Deputy Copeland and Grimes.

[14] Deputy Copeland testified that upon arriving at the scene, he noticed the cracked windshield and that Grimes's eyes "'look[ed] terrible'" Tr. p. 45. He also observed his speech and movements to be slow compared to his prior encounter with Grimes.[1] In part because Grimes was complaining about Lieutenant Snead's administration of the field sobriety tests, Deputy Copeland administered the HGN Test, the walk and turn test, and the one-leg stand test. He observed that Grimes started the walk and turn test a bit early and with the wrong foot. He also took ten steps instead of nine and missed placing his feet

---

[1] Deputy Copeland was also present during the prior interaction when Lieutenant Snead issued Grimes a warning for driving with a cracked windshield.

heel to toe on a few steps. With respect to the second administration of the one-leg stand test, Grimes started early and swayed a little bit but did not miss any counting. Deputy Copeland administered the tests on the asphalt, and Lieutenant Snead administered the tests on an area with gravel and dirt.

[15] Lieutenant Snead ask Grimes once again if he would submit to a chemical test. When Grimes responded that he would not, Lieutenant Snead handcuffed Grimes. Lieutenant Snead testified that he arrested Grimes for Operating While Intoxicated, because his actions and movements were slow. His state of mind was not consistent with his previous observations of Grimes. Moreover, Grimes failed two of the three field sobriety tests administered, his pupils were constricted, and he had difficulty pulling over when Lieutenant Snead initiated the traffic stop.

[16] Grimes was then transported to the Sullivan County Jail. Here, Rick Loudermilk, a parole agent, observed Grimes between 2:00 p.m. and 3:00 p.m. in a holding cell later that same day. When Loudermilk arrived at the cell, Grimes was asleep on the floor. After Loudermilk woke up Grimes, Loudermilk observed that Grimes appeared intoxicated. He specifically observed that Grimes's eyes were glazed over and that Grimes seemed slow to respond and process the conversation. Loudermilk had had several interactions with Grimes in the past, and he testified that he had never seen Grimes act in the manner he had on the day in question.

[17] Bobbie Pirtle, Grimes's friend, was in the passenger seat the day Grimes was arrested. She testified that she has known Grimes all of her life. She was with him all morning. She testified she did not observe him taking any drugs or substances. She also testified that she believes Grimes does not drink. She agrees that Grimes was not understanding Lieutenant Snead's commands and was trying to help Grimes understand the commands until Lieutenant Snead "told [her] to shut up." Tr. p. 69. She stated she did not notice anything unusual about his actions that morning. She also testified that in 2012, Snead was in a car accident and his speech has been slower ever since.

[18] Faye Pirtle, grandmother to Grimes, also testified on behalf of Grimes. She also stated that Grimes has had trouble with one of his eyes as a result of a previous car accident. She stated she was driving by during the interactions between Grimes and Lieutenant Snead. Lieutenant Snead motioned for her to continue on down the road, but she called to Grimes, "are you okay?" Tr. p. 79. Faye testified that Grimes seemed fine during that interaction.

[19] The trial court held a bench trial on June 1, 2018. After the bench trial, the trial court found him guilty of Operating a Motor Vehicle While Intoxicated and sentenced him to sixty days executed. Grimes now appeals his conviction

## Discussion and Decision

[20] Upon a challenge to a conviction based on the sufficiency of evidence to support a conviction, a reviewing court does not reweigh the evidence or judge the credibility of the witnesses. *Alkhalidi v. State*, 753 N.E.2d 625, 627 (Ind.

2001). Appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Bald v. State*, 766 N.E.2d 1170, 1173 (Ind. 2002). We "must affirm 'if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt.'" *McHenry v State*, 820 N.E.2d 124, 126 (Ind. 2005) (citing *Tobar v. State*, 740 N.E.2d 109, 111–12 (Ind. 2000). A conviction may be based upon circumstantial evidence alone. *Perez v. State*, 872 N.E.2d 208, 213 (Ind. Ct. App. 2007), *trans. denied*. Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Id.*

[21] In order to convict Grimes of his charge of operating a vehicle while intoxicated, the State was required to prove beyond a reasonable doubt that he was operating a motor vehicle while intoxicated. Ind. Code § 9-30-5-2. The evidence is clear that Grimes was operating a motor vehicle, and Grimes does not dispute that he was operating a motor vehicle. However, Grimes disputes that the State met its burden of proving beyond a reasonable doubt that that he was intoxicated. Grimes attributes his slow dexterity to a prior head injury, poor vision in one eye, and feeling groggy from waking up shortly before the traffic stop. "Intoxicated" is defined by the Indiana Code section 9-13-2-86 as:

> under the influence of:
>
> > (1) alcohol;
>
> > (2) a controlled substance (as defined in IC 35-48-1);

(3) a drug other than alcohol or a controlled substance;

(4) a substance described in IC 35-46-6-2 or IC 35-46-6-3;

(5) a combination of substances described in subdivisions (1) through (4); or

(6) any other substance, not including food and food ingredients (as defined in IC 6-2.5-1-20), tobacco (as defined in IC 6-2.5-1-28), or a dietary supplement (as defined in IC 6-2.5-1-16);

so that there is an impaired condition of thought and action and the loss of normal control of a person's faculties.

[22] "The State need not present separate proof of impairment of action, impairment of thought, and loss of control of faculties to establish an individual's intoxication." *Woodson v. State*, 966 N.E.2d 135, 142 (Ind. Ct. App. 2010), *trans. denied*. An individual's impairment is determined by considering his capability as a whole, not component by component, such that impairment of any of these three abilities equals impairment. *Id.* "Evidence of the following can establish impairment: (1) the consumption of significant amounts of alcohol; (2) impaired attention and reflexes; (3) watery or bloodshot eyes; (4) the odor of alcohol on the breath; (5) unsteady balance; (6) failure of field sobriety tests; (7) slurred speech." *Fields v. State*, 888 N.E.2d 304, 307 (Ind. Ct. App. 2008) (quoting *Ballinger v. State,* 717 N.E.2d 939, 943 (Ind. Ct. App. 1999)).

Here, three officials who had prior encounters with Grimes testified that his attention and processing were impaired. Deputy Copeland testified that, on the day in question, Grimes's eyes appeared "terrible." Lieutenant Snead testified that Grimes's pupils appeared severely constricted even when in the shade. Grimes was slow to pull over and had difficulty providing Lieutenant Snead with his registration. Grimes failed two out of the three field sobriety tests administered, unable to walk on the line. Several hours later, a parole agent who also had prior interactions with Grimes observed him in the holding cell at the jail. The parole agent also observed that Grimes appeared to be intoxicated because his eyes were glazed over and he was slow to process the conversation and the interactions between the two. Grimes's friend admitted his processing was slow that day but that he had an unspecified head injury in a car accident in 2012. Grimes's grandmother testified that he seemed fine when she asked him a question as she drove by. Grimes's request for this court to believe his friend and grandmother is a request to judge credibility and reweigh the evidence, which we will not do.

## Conclusion

The record in this matter contains sufficient evidence regarding Grimes's impairment and intoxication. Accordingly, we uphold the conviction for operating a vehicle while intoxicated.

Affirmed.

Vaidik, C.J., and Crone, J., concur.